UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DENISE ROSARIO | CIVIL ACTION |
| VERSUS | NO. 18-1701 |
| ST. TAMMANY PARISH HOSPITAL SERVICE DISTRICT NO. 1 | SECTION "R" (3) |

## ORDER AND REASONS

Before the Court is defendant's motion for summary judgment on plaintiff's claims for equitable and monetary relief under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Section 1557 of the Patient Protection and Affordable Care Act. The Court grants defendant's motion on plaintiff's equitable claims, because plaintiff does not present any evidence that she has standing to assert those claims. The Court also grants summary judgment on plaintiff's claim for compensatory damages, because even when drawing all inferences in plaintiff's favor, no reasonable juror could conclude that defendant intentionally discriminated against her.

## I.    BACKGROUND

This case arises out of allegations of disability discrimination by plaintiff Denise Rosario.[1] Plaintiff is a deaf individual who communicates by using primarily American Sign Language (ASL).[2] She reads English at a second-grade level.[3] On January 4, 2018, plaintiff visited her obstetrician, Dr. Joseph Kuebel, for a routine check-up.[4] At this check-up, plaintiff was accompanied by an ASL interpreter she frequently uses for her healthcare visits, Shari Bernius.[5] At the time of this appointment, plaintiff was 32 weeks pregnant.[6] Dr. Kuebel determined that plaintiff's blood pressure was high, and instructed her to go to the emergency room at defendant St. Tammany Parish Hospital immediately.[7] The hospital's records indicate that plaintiff arrived in the emergency room at 1:39 p.m.[8] There is no dispute that upon plaintiff's arrival at the hospital, hospital staff identified that she was a deaf individual and mute.[9] Plaintiff testified that when she arrived at the

---

[1]     R. Doc. 1.
[2]     R. Doc. 1 at 2 ¶ 1.
[3]     R. Doc. 48-3 at 90.
[4]     R. Doc. 48-1 at 19 ¶ 63.
[5]     R. Doc. 48-19 at 28, 45.
[6]     R. Doc. 37-2 at 3-4 ¶ 14; R. Doc. 48-1 at 4 ¶ 14.
[7]     R. Doc. 48-1 at 20 ¶ 66.
[8]     R. Doc. 37-9 at 1.
[9]     *Id.* at 5.

emergency room, she wrote on a piece of paper that she needed a sign language interpreter.[10]

Defendant's Administrative Policy and Procedures provide that "[w]ritten information, questions and instructions will be provided to . . . hearing-impaired patients as warranted."[11] The policy further provides that if "written communication is not sufficient and if the patient communicates in sign language, a qualified interpreter will be provided as needed either through the Language Line VRI services or the Deaf Action Center of Greater New Orleans."[12] According to plaintiff's expert, VRI is "videoconferencing technology where one individual, typically the interpreter, is at a different location" than the person who needs the interpreter's services.[13] The policy also provides a phone number for the Deaf Action Center of Greater New Orleans (DAC of Greater New Orleans)—504-615-7122.[14] This is coincidentally the phone number for Shari Bernius, the interpreter plaintiff uses for her appointments with Dr. Kuebel.[15]

---

[10]    R. Doc. 48-19 at 32.
[11]    R. Doc. 48-2 at 1.
[12]    *Id.*
[13]    R. Doc. 48-3 at 70.
[14]    R. Doc. 48-2 at 1.
[15]    R. Doc. 48-15 at 6.

Kim Reitz, a hospital nurse, provided care to plaintiff on the day she arrived in the emergency room.[16]  Before Reitz met with plaintiff, a hospital staff member notified Reitz that plaintiff was a deaf individual.[17]  Consistent with defendant's policy, Reitz retrieved an iPad to communicate with plaintiff through VRI.[18]  This was the first time plaintiff had ever attempted to communicate with someone through VRI.[19]

Reitz testified that she first used the VRI to ask plaintiff whether plaintiff could read and write, and that plaintiff responded that she could.[20]  Reitz further testified that she told plaintiff what treatment she would be provided.[21]  According to Reitz, she held the iPad in front of plaintiff as she explained this, and the interpreter on the screen translated what she said to plaintiff.[22]  Plaintiff testified that during this initial interaction, the VRI would "disconnect from the Wi-Fi" and would "get sort of like pixilated and then it would sort of freeze where the picture was not there and then the picture would totally be gone at times."[23]  Kevin Pichon, the father of

---

[16]    R. Doc. 37-2 at 5 ¶ 19; R. Doc. 48-1 at 5 ¶ 19.
[17]    *Id.*
[18]    *Id.*
[19]    R. Doc. 37-2 at 5 ¶ 21; R. Doc. 48-1 at 5 ¶ 21.
[20]    R. Doc. 35-1 at 33-34.
[21]    *Id.* at 40.
[22]    *Id.*
[23]    R. Doc. 48-19 at 52-53.

4

plaintiff's children, was also in the room during this initial interaction.[24]

Pichon is also a deaf individual who communicates through ASL.[25] Plaintiff

testified that Pichon's reading and writing ability is "very limited."[26] Pichon

testified that during this conversation, the video screen was "glitching and

the Wi-Fi had a bad connection."[27] He further testified that plaintiff was

visibly "mad and frustrated" because she could not understand the

interpreter on the VRI.[28] Both Reitz and plaintiff testified that after this

initial interaction, plaintiff asked Reitz directly for an on-site interpreter.[29]

Plaintiff testified that she gave Reitz a card that contained Bernius's

phone number.[30] Reitz denies that plaintiff ever handed her a card.[31] Reitz

testified that she left the room and called a number for ASL interpreter

services listed at a desk in the nursing station.[32] The list included phone

numbers for two organizations.[33] At the top of the list it offers three numbers

---

[24]     R. Doc. 48-18 at 20.
[25]     R. Doc. 48-19 at 61.
[26]     *Id.* at 79.
[27]     R. Doc. 48-18 at 20.
[28]     *Id.* at 20-21.
[29]     R. Doc. 35-1 at 40; R. Doc. 48-19 at 34.
[30]     R. Doc. 48-19 at 34.
[31]     R. Doc. 35-1 at 42.
[32]     R. Doc. 37-2 at 6 ¶ 28; R. Doc. 35-1 at 37.
[33]     *See* R. Doc. 48-10 (photo of the sign at the nursing station); R. Doc. 48-8 at 2 (defendant stating in its answers to plaintiff's discovery requests that this sign represents the sign posted at the nursing station on January 4, 2018).

for the Northshore Deaf Action Center (Northshore DAC)—two daytime numbers and one "after hours emergency number."[34]  The record indicates that beginning in December 2011, defendant had a service agreement with the Northshore DAC, but that the agreement was terminated in July 2017, about six months prior to plaintiff's visit.[35]  Below the Northshore DAC, the list includes two numbers for the DAC of Greater New Orleans, the provider that is included in defendant's administrative policies.[36]  One of the listed numbers for the DAC of Greater New Orleans is for Bernius.[37]  The number listed for Bernius is the same phone number on defendant's policy document.[38]  It is also the same number that was on the business card plaintiff says she handed Reitz.[39]

Defendant's phone records indicate that at 1:56 p.m., Reitz called the first number listed for the Northshore DAC, and that the phone call lasted nearly two minutes.[40]  Reitz testified that a representative at the Northshore DAC informed her that no interpreter was available without a prior

---

[34]     R. Doc. 48-10.

[35]     *See* R. Doc. 48-5 (letter from defendant's staff attorney to the Northshore DAC notifying it that defendant had "secured [ASL] services from other providers, and will no longer require" its services).

[36]     R. Doc. 48-10.

[37]     *Id.*; R. Doc. 48-18 at 34.

[38]     R. Doc. 48-2 at 1; R. Doc. 48-10.

[39]     *Id.*; R. Doc. 48-15 at 6.

[40]     R. Doc. 37-2 at 6 ¶ 29; R. Doc. 48-1 at 9 ¶ 29; R. Doc. 48-11.

appointment.[41] There is no evidence in the record that Reitz called any of the other numbers listed on the sign. Reitz noted in plaintiff's medical records that at around 2:00 p.m. she tried to reach a translator at plaintiff's request, but that she was "unsuccessful."[42] Reitz testified that she returned to plaintiff and told her through the VRI that an on-site interpreter was not available.[43] Plaintiff testified that when Reitz returned, she "wrote to" plaintiff that she was sorry but there were no available on-site interpreters.[44]

The medical records indicate that at 2:30 p.m., plaintiff was taken to have an ultrasound performed, and that plaintiff returned to her previous room at 3:38 p.m.[45] According to Reitz, plaintiff left for the ultrasound with a nursing assistant, who brought the iPad equipped with the VRI.[46] Plaintiff testified that the staff member who performed the ultrasound "struggled" with the VRI during the procedure.[47] Then, when plaintiff returned from the ultrasound to her original room, Reitz utilized the VRI to provide discharge instructions to plaintiff.[48] Plaintiff testified that during this conversation,

---

[41]     R. Doc. 35-1 at 46.
[42]     R. Doc. 37-9 at 4.
[43]     R. Doc. 35-1 at 67-68.
[44]     R. Doc. 48-19 at 34-35.
[45]     R. Doc. 37-9 at 4.
[46]     R. Doc. 35-1 at 69.
[47]     R. Doc. 48-19 at 59.
[48]     R. Doc. 37-2 at 7 ¶ 33; R. Doc. 48-19 at 37.

the VRI "finally . . . worked" but that the person on the screen "used different signs," so that plaintiff "didn't understand what they were saying."[49] Reitz also gave plaintiff written discharge instructions.[50] The instructions stated that plaintiff should "CONTINUE these medications which have NOT CHANGED," and listed four medications that plaintiff had previously been taking, including her blood pressure medication.[51] The instructions also provided an explanation for a new antibiotic medication plaintiff was prescribed.[52] Reitz noted in plaintiff's medical records that she gave these instructions at 4:29 p.m., and that plaintiff "verbally acknowledged understanding" them.[53]

Plaintiff testified that although she received a paper copy of her discharge instructions, she did not understand the "big words" in the instructions.[54] Plaintiff conceded during her deposition that Reitz was able to communicate to her that she should take the prescription to a pharmacy to have it filled.[55] But plaintiff testified that when she returned home, she

---

[49]    R. Doc. 48-19 at 37.
[50]    R. Doc. 37-2 at 7 ¶ 33; R. Doc. 48-1 at 10; R. Doc. 37-9 at 6.
[51]    *Id.*
[52]    R. Doc. 37-2 at 7 ¶ 33; R. Doc. 48-1 at 11.
[53]    R. Doc. 37-9 at 4.
[54]    R. Doc. 48-19 at 65-66.
[55]    *Id.* (testifying that Reitz "showed [her] the prescription paper and wrote go to Walgreens and get this").

8

was scared about the health of her unborn child because she did not fully understand what Reitz had communicated to her.[56]  Later that same day, plaintiff went to a pharmacy to fill her prescription.[57]

According to plaintiff, on January 9, 2018, she returned to Dr. Kuebel for an appointment that had already been scheduled before her January 4 hospital visit.[58]  Bernius was present to interpret for plaintiff at this appointment.[59]  Plaintiff testified that her blood pressure was still very high at this appointment, which alarmed Dr. Kuebel.[60]  According to plaintiff, she had been taking only the new antibiotic medication the hospital prescribed to her because she thought it was for her blood pressure.[61]  In fact, the new medication was a separate antibiotic for cold symptoms she was experiencing.[62]  Plaintiff evidently also ceased taking her actual blood pressure medication, which had been prescribed to her previously.  The medical records for plaintiff's appointment with Dr. Kuebel corroborate her testimony.[63]  A nurse wrote that plaintiff said she thought the newly

---

[56]    *Id.* at 37.
[57]    *Id.* at 71.
[58]    *Id.* at 74.
[59]    *Id.* at 73.
[60]    *Id.* at 38.
[61]    *Id.*
[62]    *Id.*
[63]    R. Doc. 48-8 at 2.

prescribed medication was for her high blood pressure, and as a result she had not taken the appropriate blood pressure medication since her hospital visit on January 4.[64] Dr. Kuebel himself wrote that plaintiff had "not been compliant with medications."[65]

Plaintiff testified that immediately after this appointment on January 9, 2018, she went to defendant's hospital again.[66] She testified that Bernius was at the hospital during this visit to help interpret.[67] According to plaintiff, she stayed overnight at the hospital on the 9th for observation so that the doctors could try to lower her blood pressure.[68] Plaintiff testified that doctors at the hospital ultimately decided to perform a C-section procedure on January 11, 2018, which was successful.[69] After her daughter was born, plaintiff remained at the hospital while her daughter was in the neonatal intensive care unit.[70] During this period, plaintiff was able to communicate with defendant's staff by calling Bernius via video-chat on her cellphone, and having Bernius interpret the conversation remotely.[71]

---

[64]   *Id.*
[65]   *Id.*
[66]   R. Doc. 48-19 at 41-42.
[67]   *Id.* at 41, 78.
[68]   *Id.* at 42.
[69]   *Id.* at 42-43.
[70]   R. Doc. 37-2 at 9 ¶ 41; R. Doc. 48-1 at 11 ¶ 41.
[71]   *Id.*

On February 19, 2018, plaintiff filed this action alleging violations of Title II of the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act, and Section 1557 of the Patient Protection and Affordable Care Act (ACA).[72] Plaintiff contends that defendant discriminated against her on the basis of her disability by refusing to provide her with auxiliary aids and services necessary to ensure effective communication.[73] Plaintiff alleges that defendant's refusal resulted in a denial of access to the services, programs, and benefits defendant offers to other individuals.[74] Plaintiff further alleges that defendant's violation of these statutes caused her to experience "fear, anxiety, emotional distress, . . . and mental anguish regarding her health and the health of her then-unborn baby."[75] She seeks (1) a declaratory judgment that defendant discriminated against her in violation of the three statutes, (2) an injunction forbidding defendant from implementing or enforcing any policy, procedure, or practice that denies deaf individuals meaningful access to defendant's services, and (3) compensatory and nominal damages under the statutes, as well as her reasonable costs and attorneys' fees.[76]

---

[72]    R. Doc. 1 at 13-18.
[73]    *Id.* at 15 ¶ 79.
[74]    *Id.*
[75]    *Id.* at 10 ¶ 45.
[76]    *Id.* at 18-20.

Defendant moves for summary judgment on all of plaintiff's claims.[77]

Plaintiff opposes the motion.[78]

## II.    LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could

---

[77]    R. Doc. 37.
[78]    R. Doc. 48.

not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (internal citation omitted). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for

trial. *See, e.g.*, *id.*; *Little*, 37 F.3d at 1075 ("Rule 56 *mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (quoting *Celotex*, 477 U.S. at 322)).

## III. DISCUSSION

### A. Declaratory and Injunctive Relief

Defendant argues that plaintiff lacks standing to seek declaratory or injunctive relief because she has not shown an intention to seek future treatment from defendant. A plaintiff must satisfy the standing requirements of Article III of the U.S. Constitution to establish the existence of an "actual case or controversy" subject to federal jurisdiction. *O'Shea v. Littleton*, 414 U.S. 488, 493-94 (1974). As the party invoking federal jurisdiction, plaintiff bears the burden of demonstrating each element of standing. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Standing requires that (1) the plaintiff suffered an injury-in-fact; (2) the injury is "fairly traceable" to the challenged conduct of the defendant; and (3) it must be "likely, as opposed to merely speculative," that the plaintiff's injury will be redressed by a favorable judicial decision. *See Lujan v. Defs. of Wildlife*, 504

U.S. 555, 560-61 (1992) (internal quotation marks and citation omitted). To establish standing to seek injunctive relief, a plaintiff must show a "real or immediate threat that the plaintiff will be wronged again." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

Plaintiff does not oppose defendant's motion for summary judgment on her claims for declaratory or injunctive relief.[79] Plaintiff does not present any evidence that she plans to seek future treatment from defendant, or that there is otherwise a real or immediate threat that she will be wronged again. Summary judgment for defendant on these claims is therefore proper. *See Celotex*, 477 U.S. at 324-25.

### B.   Compensatory Damages

Plaintiff sues for money damages under Title II of the ADA, 42 U.S.C. § 12132, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Section 1557 of the ACA, 42 U.S.C. § 18116. Title II of the ADA and Section 504 of the Rehabilitation Act have identical remedial schemes. *See* 42 U.S.C. § 12133 (referencing 29 U.S.C. § 794a as the source of its remedies); 29 U.S.C. § 794a(a)(2) (stating it is the remedial statute for 29 U.S.C. § 794). Accordingly, the remedial schemes of the two statutes are generally interpreted interchangeably. *See Kemp v. Holder*, 610 F.3d 231, 234 (5th

---

[79]     *See* R. Doc. 48 at 4 n.22.

Cir. 2010); *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000). Both statutes apply to defendant. *Id.* To show a violation of either statute, a plaintiff must prove "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).

Pursuant to Section 1557 of the ACA, "an individual shall not, on the ground prohibited under . . . Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance. . . ." 42 U.S.C § 18116.

All three statutes include a private right of action for monetary damages. *See United States v. Georgia*, 546 U.S. 151, 154 (2006) (recognizing that Title II authorizes suits by private citizens for money damages against public entities that violate § 12132); *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) ("It is established that Title II and § 504 are enforceable through an implied private right of action."); *Smith v. Ochsner Med. Center-Westbank, LLC*, No. 17-11898, 2019 WL 296860, at *6 (E.D. La. Jan. 23, 2019) (recognizing that Section 1557 of the

ACA provides a private right of action for money damages). But a plaintiff can recover money damages under the statutes only if she proves the defendant violated the statutes and that the discrimination was intentional. *See Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002) ("A plaintiff asserting a private cause of action for violations of the ADA or the [Rehabilitation Act] may only recover compensatory damages upon a showing of intentional discrimination."); *see also Back v. Tex. Dep't of Criminal Justice Inst. Div.*, 684 F. App'x 356, 358 (5th Cir. 2017); *Smith*, 2019 WL 296860, at *6 (requiring a showing of intentional discrimination to recover under the ACA).

The parties do not contest that plaintiff has a qualifying disability. They instead dispute whether plaintiff was denied services on the basis of her disability, and whether defendant intentionally discriminated against plaintiff.

The Fifth Circuit has repeatedly declined to adopt a specific standard of intent for these statutes. *See Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 574 (5th Cir. 2018); *Perez v. Doctors Hosp. at Renaissance, Ltd.*, 624 F. App'x 180, 184 (5th Cir. 2015). But the Fifth Circuit has nonetheless offered some guidelines for what may constitute intent. In *Perez*, the Fifth Circuit noted that intent implies purposeful action. 624 F.

App'x at 184 ("We conclude that on the present record, there is enough to show a dispute of material fact on whether [defendant] intentionally, *i.e.*, purposefully, discriminated."). In *Miraglia*, the court explained that intent "requires that the defendant at least have actual notice of a violation." 901 F.3d at 575. That is, the defendant must have some notice that its actions have caused the plaintiff to experience unlawful discrimination. *Id.* (reversing district court and rendering judgment for defendant when district court failed to make any findings that the defendant had actual notice of a violation). In *Miraglia*, the court also noted that previous Fifth Circuit opinions "seem to have required that a plaintiff prove . . . something more than 'deliberate indifference' to show intent." 901 F.3d at 575; *see also Delano-Pyle*, 302 F.3d at 575 ("There is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA or the RA."). Many other circuits use the deliberate indifference standard. *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262-63 (3d Cir. 2013) (collecting citations from other circuits that have adopted the deliberate indifference standard). Deliberate indifference requires a showing that "the defendant *knew* that harm to a federally protected right was substantially likely and *failed* to act on that likelihood." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014) (internal quotation

marks omitted) (emphasis in original). There must also be some evidence that the defendant made a "deliberate choice" not to alleviate the likely harm. *Id.* at 1147-48.

Here, plaintiff has not presented evidence showing that defendant intentionally discriminated against her in failing to provide adequate auxiliary services. Even when applying the deliberate indifference standard of intent—which the Fifth Circuit has indicated is a lower threshold than the standard that governs this Court, *Miraglia*, 901 F.3d at 575—the facts plaintiff has presented are insufficient to preclude summary judgment.

When viewing the facts in a light most favorable to plaintiff, the record shows that upon arriving at the hospital, plaintiff requested an on-site interpreter.[80] Defendant's initial unwillingness to secure an on-site interpreter, and Reitz's initial reliance on the VRI and written communication, is not alone evidence of deliberate indifference. *See Martin v. Halifax Healthcare Sys., Inc.*, 621 F. App'x 594, 604 (11th Cir. 2015) ("[A] hospital's failure to provide an interpreter on demand is not sufficient to support a finding of deliberate indifference." (citing *McCullum*, 768 F.3d at 1147)). Regulations promulgated to implement the ADA's provisions state that appropriate auxiliary aids and services for the hearing impaired include

---

[80]     R. Doc. 37-9 at 1; R. Doc. 48-19 at 32.

"[q]ualified interpreters on-site or through video remote interpreting (VRI) services." 28 C.F.R. §§ 35.104(1), 35.160(b)(1). Reitz's initial use of the VRI and written communication instead of securing an on-site interpreter was also consistent with defendant's policies.[81]

When the VRI began to malfunction, plaintiff became visibly frustrated by the quality of the VRI and reiterated her request for an on-site interpreter.[82] Reitz did not ignore plaintiff's request. Indeed, plaintiff does not dispute that Reitz left the room and called the Northshore DAC.[83] The hospital's phone records confirm that Reitz placed this call.[84] Reitz testified that a representative from the Northshore DAC told her that no one was available to come to the hospital on such short notice.[85] Plaintiff has not presented any facts that dispute Reitz's testimony about this phone call.

Plaintiff has two main arguments for how Reitz's actions at this point in the narrative constitute intentional discrimination. First, plaintiff argues that Reitz's call to the Northshore DAC violated the hospital's formal policies, which instruct the staff to contact the DAC of Greater New Orleans.[86]

---

[81] R. Doc. 48-2 at 1.
[82] R. Doc. 35-1 at 40; R. Doc. 48-19 at 34; R. Doc. 48-18 at 20-21.
[83] R. Doc. 48 at 12.
[84] R. Doc. 48-10.
[85] R. Doc. 35-1 at 46.
[86] R. Doc. 48 at 12; R. Doc. 48-2 at 1.

Defendant had in fact terminated its contract with the Northshore DAC months earlier.[87] Reitz testified that she called the Northshore DAC because its contact information was on a sign taped to a desk in the nursing station.[88] Defendant's corporate representative testified that even though the contract had been terminated, the Northshore DAC was still available as a resource for hospital employees to contact for ASL services.[89] Calling the Northshore DAC was thus still a viable attempt by Reitz to secure an on-site interpreter, regardless of defendant's formal policy. To the extent plaintiff argues that defendant intentionally discriminated against her by failing to update the sign at the nursing station—or otherwise notify its staff that its formal policy listed only the DAC of Greater New Orleans—that argument fails. These lapses by defendant are a type of "bureaucratic slippage" that other circuits have found "constitute[] negligence rather than deliberate action or inaction." *Updike v. Multnomah County*, 870 F.3d 939, 951 (9th Cir. 2017) (trial court's failure to schedule an on-site interpreter for the plaintiff's arraignment, resulting in a postponement of the arraignment for one day, did not constitute intentional discrimination); *Havens v. Colo. Dep't of*

---

[87]    R. Doc. 48-5.

[88]    R. Doc. 35-1 at 93-94; R. Doc. 48-10.

[89]    R. Doc. 48-16 at 34 (testifying that even after the contract was terminated, hospital employees "could contact [the Northshore DAC] and they would bill [defendant] for the service they provide").

*Corr.*, 897 F.3d 1250, 1270 n.12 (10th Cir. 2018). Reitz's calling the Northshore DAC is therefore not, by itself, even evidence of deliberate indifference.

Second, plaintiff argues that Reitz's failure to call Bernius would allow a juror to infer that Reitz intentionally discriminated against plaintiff.[90] It is true that Reitz could have reached Bernius via the card plaintiff says she handed to Reitz, or via the sign posted at the nursing station under the DAC of Greater New Orleans.[91] Reitz's failure to call the number listed on the card plaintiff handed her is not an indication that Reitz behaved with deliberate indifference to plaintiff's disability. The Eleventh Circuit has found, in an almost identical scenario to the one here, that failing to call a plaintiff's preferred interpreter did not constitute deliberate indifference. *See Saltzman v. Bd. of Comm'rs of N. Broward Hosp. Dist.*, 239 F. App'x 484, 486-88 (11th Cir. 2007) (hospital staff's failure to call a phone number for an interpreter listed on a business card that the plaintiff's daughter provided was not evidence that hospital was deliberately indifferent to the plaintiff's needs, when the hospital called one of two phone numbers for ASL services listed in the hospital's accommodation policy, but was unable to secure an

---

[90]     R. Doc. 48 at 12.
[91]     R. Doc. 48-10; R. Doc. 48-19 at 34.

on-site interpreter). Reitz testified that she knew the hospital's policies provided a phone number for ASL services in the event she needed an on-site interpreter.[92] She explained that she believed the "number taped to the desk" in the nursing station was the number included in the policy.[93] Thus, by referring to the list at the nursing station, Reitz believed she was adhering to the hospital's policies. Even assuming plaintiff did hand Reitz Bernius's card, no reasonable juror could infer that Reitz was deliberately indifferent to plaintiff's needs—let alone acting with the intent required in the Fifth Circuit—by refusing to take steps outside of what she believed to be the hospital's policies.

Nor is Reitz's failure to call either of the numbers listed for the DAC of Greater New Orleans—one of which would have connected her with Bernius—evidence that she acted with deliberate indifference to plaintiff's needs. *See id.* at 486-88. As already addressed, Reitz attempted to contact one of the two organizations listed on the sign at the nursing station. It was at worst negligent or careless of Reitz not to call the second organization listed. *Id.* at 488 (calling one of two approved numbers for ASL services is not evidence of deliberate indifference). Negligence is not evidence of

---

[92]    R. Doc. 35-1 at 37.
[93]    *Id.*

deliberate indifference or intentional discrimination. *Id.* (noting that although the hospital staff's attempt to secure an on-site interpreter "may have been negligently made, negligence is not intentional discrimination"); *see also Jacobs v. W. Feliciana Sheriff's Dept.*, 228 F.3d 388 (5th Cir. 2000) (in the context of a Section 1983 claim, noting that deputy sheriff's "failure to abide by" certain policies "evinces at best[] negligence . . . which is insufficient to support a finding of deliberate indifference"). And if Reitz's actions in calling only the Northshore DAC do not amount to deliberate indifference, they do not amount to intentional discrimination in the Fifth Circuit. *Miraglia*, 901 F.3d at 575.

But the record also suggests that it was not even negligent or careless of Reitz to not call the second organization listed at the nursing station. Plaintiff arrived in defendant's emergency room at Dr. Kuebel's instruction because of her high blood pressure.[94] As plaintiff explained during her deposition, her medical situation was "really serious" given the late stage of her pregnancy.[95] The record indicates that the Northshore DAC informed Reitz that they could not send an on-site interpreter without a prior appointment.[96] At the time of this call, Reitz still had to send plaintiff for an

---

[94] R. Doc. 48-19 at 30.
[95] *Id.* at 31.
[96] R. Doc. 48-17 at 46.

ultrasound to assess the health of her unborn child.[97] Making additional calls to ASL service providers, after she had been informed by one organization that an interpreter was not available on such short notice, would have delayed plaintiff's treatment in an emergency situation. Thus, even when drawing all inferences in plaintiff's favor, Reitz's decision to not make these additional calls was a reasonable decision under the circumstances. Her behavior is certainly not evidence of intentional discrimination.

Finally, Reitz did not intentionally discriminate against plaintiff during discharge. Plaintiff conceded during her deposition that when Reitz spoke to her to give her instructions at discharge, the VRI "finally . . . worked" and did not glitch or freeze intermittently.[98] She testified that she still could not understand the interpreter on the screen because the interpreter "used different signs."[99] But there is no indication in the record that plaintiff made it known to Reitz that even though the VRI was not malfunctioning as it was before, she was still unable to understand the interpreter on the screen.[100]

---

[97]    *Id.* at 63-64; R. Doc. 37-9 at 4.
[98]    R. Doc. 48-19 at 37.
[99]    *Id.*
[100]   By contrast, Pichon testified that when the VRI was malfunctioning when plaintiff first arrived, plaintiff was visibly frustrated. R. Doc. 48-18 at 20-21. Plaintiff testified that when the VRI malfunctioned initially she "gestured" to the hospital staff that the VRI was not working. R. Doc. 48-19 at 33.

Before intent can be imputed on a defendant, the defendant "must have notice of a violation." *Miraglia*, 901 F.3d at 575 (defendant did not intentionally discriminate by not providing adequate wheelchair-accessible ramps at its entrance when there was no evidence the defendant had notice the ramps were not ADA-compliant). Because there is no evidence that plaintiff notified anyone at discharge that the accommodation the hospital provided her was ineffective, no reasonable juror could find that Reitz intentionally discriminated against plaintiff at discharge. *Id.*; *McCullum*, 768 F.3d at 1148 (no finding of deliberate indifference when there was "no evidence to support a conclusion that [defendant's] staff knew that their accommodations were ineffective").

Plaintiff contends that when viewing the record in her favor, this case is "legally indistinguishable" from the facts in *Perez* and *Delano-Pyle*.[101] But that is not the case. In *Perez*, the plaintiffs' four-month-old daughter was diagnosed with a brain tumor, which necessitated dozens of hospital visits over a four-and-a-half-year period. 624 F. App'x at 182. The plaintiffs were both deaf individuals who relied upon ASL to communicate. *Id.* At summary judgment, they presented evidence that the defendant hospital "repeatedly failed to provide them an interpreter" on 18 occasions over this period. *Id.*

---

[101]    R. Doc. 48 at 12.

at 185. One plaintiff testified that sometimes when she would request an interpreter, the "nurses would say no." *Id.* On the occasions when an interpreter was ultimately provided, they would sometimes have to wait "upwards of a full day" for the interpreter to arrive. *Id.* at 182. The defendant also occasionally attempted to use VRI to communicate with plaintiffs, but plaintiffs presented evidence that the VRI did not always function properly. *Id.*

Unlike *Perez*, this is not a case where a defendant's repeated failure to properly accommodate the plaintiff over an extended period of time allows for an inference of intentional discrimination. Rather, plaintiff's case is limited to her experience on one emergency visit that lasted approximately three hours. During that emergency visit, the hospital first provided plaintiff with an interpreter through VRI, and then attempted to secure an on-site interpreter when the nurse was notified that the VRI was malfunctioning. Plaintiff admits that she was able to effectively communicate with defendant's staff during her subsequent visit.[102] *Perez* is thus entirely inapposite.

In *Delano-Pyle*, a police officer arrived at the scene of a car accident and found the plaintiff, who informed the officer that he was severely

---

[102] *See* R. Doc. 37-2 at 9 ¶¶ 40-41; R. Doc. 48-1 at 11 ¶¶ 40-41.

hearing-impaired. 302 F.3d at 570. The officer proceeded to administer three sobriety tests to the plaintiff without asking him what forms of communication would be most effective. *Id.* When the plaintiff failed these tests, the officer read him his Miranda rights. *Id.* at 571. The officer then took the plaintiff to the police station, read him his legal rights again, and wrote his Miranda warnings on a blackboard. *Id.* With full knowledge that the plaintiff was hearing-impaired, the officer then interrogated the plaintiff "without any accommodations to ensure that [the plaintiff] understood the circumstances of his arrest." *Id.* The Fifth Circuit concluded that the jury's verdict in favor of the plaintiff was not plainly erroneous because the officer had knowledge of the plaintiff's impairment, admitted that he was unsure whether the plaintiff understood him during the sobriety test and when he verbally communicated his legal rights, but did not provide *any* sort of accommodation to assist the plaintiff in understanding what the officer was saying. *Id.* at 575-76.

Unlike the officer in *Delano-Pyle*, defendant *did* attempt to accommodate plaintiff's disability. Reitz first provided plaintiff with an interpreter through VRI, and then attempted to secure an on-site interpreter when the VRI malfunctioned. As already addressed, that the VRI initially malfunctioned, and that Reitz was—at worst—negligent in attempting to

secure an on-site interpreter, is not enough to support an inference that Reitz was deliberately indifferent to plaintiff's needs. This is especially true considering the nature of plaintiff's emergency visit to the hospital. Because the evidence before the Court is not even enough to show that defendant was deliberately indifferent, it is not enough to establish intentional discrimination in the Fifth Circuit. *Miraglia*, 901 F.3d at 575 (noting that the Fifth Circuit has previously required "something more than 'deliberate indifference' to show intent").

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED. Plaintiff's claim for compensatory damages is DISMISSED WITH PREJUDICE. Plaintiff's claims for injunctive and declaratory relief are DISMISSED WITHOUT PREJUDICE.

New Orleans, Louisiana, this __22nd__ day of April, 2019.

_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE